■ CONERGICS CORPORATION et al., Appellants-Respondents, v DEARBORN MID-WEST CONVEYOR Co. et al., Respondents-Appellants, et al., Defendant. [43 NYS3d 6]—

Order, Supreme Court, New York County (Lawrence K. Marks, J.), entered June 12, 2015, which denied plaintiffs' motion for summary judgment declaring, upon the fourth cause of action, that they are not obligated to indemnify defendants Dearborn Mid-West Conveyor Co. (Dearborn) and DMW Systems, Inc. (DMW) with respect to a Mexican tax audit of Dearborn for the tax year 2004, and dismissing Dearborn and DMW's counterclaims, and denied Dearborn and DMW's cross motion for summary judgment on their counterclaims for breach of contract for refusing to provide such indemnification and for a declaration that plaintiffs are obligated to provide

Dearborn and DMW with such indemnification, and dismissing plaintiffs' fourth cause of action, unanimously modified, on the law, to grant plaintiffs' motion, and it is declared that plaintiffs have no obligation to indemnify Dearborn and DMW with respect to the aforementioned tax audit, and otherwise affirmed, with costs.

The plaintiffs in this action are Conergics Corporation and its corporate parent, Tomkins Industries, Inc. (TII) (collectively, plaintiffs).[1] Before November 3, 2007, Conergics was the sole shareholder of Dearborn, a vendor of conveyor systems. On November 3, 2007, Conergics, TII and DMW, inter alia, entered into, and closed upon, a stock purchase agreement (the SPA) under which DMW agreed to purchase from Conergics 100% of the shares of Dearborn's issued and outstanding stock. The SPA provides that it is governed by New York law.[2]

At the time DMW acquired Dearborn from Conergics, Dearborn was the subject of a pending audit by the Mexican tax authority, known as Servicio de Administración Tributaria (the SAT), for the 2004 tax year. This ongoing Mexican tax audit for 2004 (hereinafter, the first audit) was disclosed to DMW in section 2.9 of the disclosure schedule to the SPA. Article 8 ("Tax Matters") of the SPA requires Conergics (and TII, as guarantor of Conergics' indemnity obligations under the SPA) to indemnify DMW with respect to the first audit and with respect to any future tax audit of Dearborn, by any taxing authority, for any period ending on or before the closing date. Specifically, section 8.1 (a) of the SPA provides in pertinent part that "the Seller [Conergics] shall indemnify the Buyer [DMW] and hold the Buyer harmless from and against . . . all Taxes of the Company [Dearborn] for all taxable periods, or portions thereof, ending on or before the Closing Date in excess of the amount of Taxes reflected in the determination of Net Working Capital (. . . including, without limitation, all Taxes relating to the Tax Audits listed in Section 2.9 of the Disclosure Schedule) ('Pre-Closing Taxes')."

Section 8.1 (c) of the SPA requires a party seeking indemnification with respect to a tax audit to give the other party

---

**1.** Unless otherwise indicated, the facts set forth herein are taken from the Joint Submission of Undisputed Facts that the parties filed with Supreme Court in connection with their respective motions for summary judgment. Although the names of Conergics and TII have been changed since November 3, 2007, this has no bearing on the issues raised by the appeal. For the sake of simplicity, we refer to plaintiffs by their respective former names, as they are identified in the caption of this matter.

**2.** Defendant Knox Lawrence International, LLC was also a party to the SPA, but has defaulted in this action and is not participating in this appeal.

"prompt[ ]" written notice of the commencement of such an audit, but further provides that "a failure to give such notice will not affect" the asserted indemnification right "except to the extent that [the indemnifying party] is actually prejudiced thereby." Section 8.1 (c) of the SPA provides: "After the Closing Date, each Party to this Agreement (whether the Buyer or the Seller, as the case may be) shall promptly notify the other Party in writing of any demand, claim or notice of the commencement of a Tax Audit (as defined in Section 8.5 [b]) received by such Party from any Taxing Authority or any other Person with respect to Taxes for which such other Party is liable pursuant to Article 6 [setting forth the SPA's general indemnification provisions] or this Article 8; provided, however, that a failure to give such notice will not affect such other Party's rights to indemnification under Article 6 or this Article 8 except to the extent that such Party is actually prejudiced thereby. Such notice shall contain factual information (to the extent known) describing the asserted Tax liability and shall include copies of the relevant portion of any notice or other document received from a Taxing Authority or any other Person in respect of any such asserted Tax liability."[3] Section 13.8 of the SPA designates the recipients, addresses and manner of delivery for any notice required by the agreement. Notices to plaintiffs are to be sent to the attention of TII's general counsel at TII's offices in Dayton, Ohio, with a copy to the company's designated outside counsel.

Section 8.5 (b) of the SPA grants Conergics the "sole right" to defend any tax audit concerning a period that ended before the closing date. Section 8.5 (b) provides in pertinent part: "Notwithstanding any other provision in this Agreement, the Seller shall have the sole right to represent the Company's [Dearborn's] interests in any audit, examination or Proceeding by any Taxing Authority ('Tax Audit') with respect to taxable periods or portions thereof ending on or before the Closing Date, including, for the avoidance of doubt, the right to control any such Tax Audit, the right to settle, compromise and/or concede any such Tax Audit and the right to employ counsel of its choice at its expense." In addition, section 8.5 (a) of the SPA

---

**3.** The parties implicitly agree that the clause following the semicolon at the end of the first sentence of section 8.1 (c) was intended to provide that the indemnifying party's obligation to indemnify would be unaffected by late notice in the absence of actual prejudice, notwithstanding the presumably inadvertent use of the phrase "such other Party's right to indemnification." We note that tax indemnity obligations under the SPA could run either way, as DMW agreed to indemnify Conergics against any tax liability of Dearborn attributable to a period beginning after the closing date.

requires the parties to "cooperate fully" with each other "in connection with any Tax Audit (as defined in section 8.5 [b]) with respect to Taxes," with "[s]uch cooperation [to] include the retention and (upon the other Party's request) the provision of records and information that are reasonably relevant to any such . . . Tax Audit and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder."

At the time of the closing under the SPA, Dearborn was petitioning the Mexican Tribunal Federal de Justicia Fiscal y Administrativa (in English, the Federal Tribunal of Fiscal and Administrative Justice) (hereinafter, the Tribunal Federal), a court that reviews the SAT's administrative determinations, to annul, on procedural grounds, the 2004 tax deficiency assessment that the SAT had rendered in the first audit in May 2007. In April 2008, the Tribunal Federal granted Dearborn's petition, resulting in the annulment of the SAT's May 2007 assessment without any ruling on the merits of the substantive issues raised by the first audit. Pursuant to its indemnification obligations under the SPA, Conergics reimbursed Dearborn for the legal fees (approximately US $66,000) the latter had incurred in obtaining the annulment of the tax assessment rendered in the first audit.

On April 19, 2012, the SAT sent a letter to Dearborn announcing its intention to reopen the audit of Dearborn's 2004 tax year (hereinafter, the second audit). The issue that was the basis for the second audit—whether certain expenses for which Dearborn had taken deductions in computing its 2004 taxes were properly deductible before the company had established a lawful domicile in Mexico—was the same issue that had been the basis for the first audit but had not been resolved in the earlier proceeding.

It is undisputed that DMW and Dearborn (collectively, defendants) did not furnish plaintiffs with written notice of the second audit in the manner specified by section 13.8 of the SPA until January 24, 2014, 21 months after defendants had received notice of the second audit from the SAT in April 2012.[4]

---

**4.** Before Supreme Court, defendants argued that they complied with the requirement of section 8.1 (c) of the SPA that they "promptly notify" plaintiffs of the second audit in May 2012, through two successive informal communications. Specifically, on May 4, 2012, Dearborn's Mexican outside accountant, Ernesto Mosso Valdez (Mosso), called Gustavo Lopez, the controller of a Mexican indirect subsidiary of TII, and told him about the initiation of the second audit. Thereafter, on May 12, 2012, Lopez sent an email to the assistant corporate secretary of TII, Kathy Sullivan, stating: "I know that

In the interim, Dearborn undertook its own defense of the second audit, both in dealing directly with the SAT and in court:

- On May 11, 2012, Dearborn initiated a proceeding in a Mexican federal court, known as an "Amparo," challenging the SAT's constitutional authority to conduct the second audit.

- On May 29, Dearborn's aforementioned Mexican outside accountant, Mosso, responded to the SAT's letter of April 19 and provided the SAT with various categories of documents it had requested.

- On October 31, 2012, the Mexican federal court rejected Dearborn's Amparo challenging the second audit. On November 28, 2012, Dearborn filed an appeal from this ruling.

- On September 13, 2013, the SAT issued an observation letter to Dearborn, setting forth proposed findings of the second audit.

- On October 15, 2013, Dearborn, through Mosso, its outside accountant, responded to the SAT's observation letter, denying that the company owed any taxes for 2004. This four-page response, which was not prepared by legal counsel, did not set forth a statute of limitations defense, but did assert that the SAT was not entitled to audit Dearborn a second time for the same tax year.

- On October 24, 2013, a Mexican federal appellate court affirmed the lower federal court's denial of Dearborn's Amparo the previous year.

- On November 19, 2013, the SAT issued a determination

---

Dearborn is not part of Tomkins any more, but for your information I received a call last Friday from the actual accountant telling me that Mexican Tax authorities will review once more the 2004 fiscal year. If Tomkins is still involved in any way please tell me and I will update you on new happenings." In ruling on the parties' respective summary judgment motions, Supreme Court rejected defendants' argument that these communications constituted the notice mandated by the SPA. In that regard, the court noted that Lopez was not an agent of any party to the SPA, that Sullivan was not a proper addressee of contractual notices under section 13.8 of the SPA, and that Lopez's informal email to Sullivan did not contain the information or documents required by section 8.1 (c) of the SPA. Although defendants have appealed from the order under review, their brief does not challenge Supreme Court's holding that they failed to "promptly notify" plaintiffs of the second audit as required by the SPA, and that aspect of their appeal has therefore been abandoned (*see Central Laborers' Pension Fund v Blankfein*, 111 AD3d 40, 45 [1st Dept 2013]).

assessing against Dearborn a total amount due of MX $29,666,985.97 (approximately US $2.2 million) in unpaid 2004 taxes, surcharges and fines. This assessment was subject to review upon an administrative appeal (which had to be filed by February 11, 2014) or in an annulment proceeding before the Tribunal Federal.

After the SAT issued its adverse determination on November 19, 2013, defendants allowed two more months to pass before sending plaintiffs a letter, dated January 24, 2014, giving notice of the second audit, demanding indemnification pursuant to the SPA, and warning that the deadline for an administrative appeal of the SAT's assessment was February 11, 2014—then less than three weeks away. By letter dated January 30, 2014, plaintiffs, through their counsel, rejected the indemnification demand and declined to assume the defense of the second audit, taking the position that defendants' 21-month delay in giving notice had prejudiced Conergics by depriving it of its right to defend the audit under section 8.5 (b) of the SPA. Thereafter, defendants, while maintaining their position that they are entitled to indemnification from plaintiffs, continued their defense of the second audit.[5]

In April 2014, plaintiffs filed an amended complaint in this action, which was then already pending concerning other disputes under the SPA. The amended complaint added a fourth cause of action seeking a declaration that plaintiffs are not obligated to indemnify defendants for the second audit by reason of defendants' failure to provide the notice required by the SPA and the consequent deprivation of plaintiffs' contractual right to control the defense of the audit. In response, defendants asserted three counterclaims relating to the indemnification dispute over the second audit: (1) for breach of plaintiffs' duty to indemnify for pre-closing tax liabilities under Article 8 of the SPA; (2) for breach of Article 6 of the SPA, the

---

5. On February 10, 2014, after plaintiffs rejected defendants' demand for indemnification, defendants filed an administrative appeal of the SAT's November 2013 tax assessment. On April 29, 2014, defendants' administrative appeal was denied and the assessment was confirmed. On August 12, 2014, defendants, through Mexican legal counsel, commenced an annulment proceeding in the Tribunal Federal seeking to overturn the assessment. The initial filing in the annulment proceeding was 146 pages long and included a statute of limitations argument. As of January 2015, when the motions resulting in the order appealed from were made, the annulment proceeding remained pending, and Dearborn, having posted a bond, had not yet paid the tax assessment.

agreement's general indemnification provision; and (3) for a declaration that plaintiffs are obligated to indemnify defendants with respect to the second audit under the SPA. After engaging in discovery, the parties made competing motions for summary judgment on plaintiffs' fourth cause of action and defendants' counterclaims, based on a Joint Submission of Undisputed Facts. In addition, defendants submitted an affirmation of a Mexican attorney, Victor L. Bermudez Cancino, Esq. (the Cancino affirmation), opining, as more fully discussed below, that, under Mexican law, Dearborn had not been procedurally precluded from "rais[ing] any fact or issues pertaining to the determination of owed taxes and charges" at the time (January 2014) defendants notified plaintiffs of the second audit and demanded indemnification.

In the order appealed from, Supreme Court denied each side's motion for summary judgment. Initially, as previously noted, the court held that defendants failed to comply with their obligation under section 8.1 (c) of the SPA to "promptly notify" plaintiffs of the second audit, a determination that is not challenged on this appeal. However, the court, agreeing with defendants to the extent they argued that a finding that plaintiffs were "actually prejudiced" by this breach would require evidence of "tangible economic injury due to defendants' late notice," found that "all parties have failed to submit sufficient proof as to whether and to what extent plaintiffs may be actually prejudiced by the delay in notifying them in writing." The court rejected plaintiffs' claim that "actual prejudice is inherent as a matter of law in the denial of plaintiffs' right to control and choose counsel," concluding that plaintiffs were required to "demonstrate some tangible economic injury" to show that defendants' breach of the SPA by denying plaintiffs this right was material. The court also determined that the Cancino affirmation submitted by defendants failed to establish as a matter of law that plaintiffs had not been actually prejudiced by defendants' breaches of the SPA. Both sides have appealed.

We begin our analysis with the observation that the question presented by this appeal is not whether timely notice of the second audit was a condition precedent to plaintiffs' obligation to indemnify defendants with respect to that audit under the SPA. As plaintiffs acknowledge, the plain language of the SPA precludes any reading of the prompt notice requirement as a condition precedent to the attachment of an obligation to indemnify. Section 8.1 (c) expressly provides that lack of prompt

notice "will not affect" the parties' respective indemnity rights and obligations "except to the extent that [the indemnitor] is actually prejudiced thereby." Thus, defendants' failure to notify plaintiffs of the second audit until 21 months after it was commenced—a breach of the SPA's notice provision that, to reiterate, is not disputed on this appeal—relieves plaintiffs of their indemnity obligations with respect to the second audit only in the event plaintiffs establish that this breach caused them "actual[ ] prejudice[ ]."

By the same token, neither does this appeal involve a dispute over the application of the "no prejudice" rule. Under the "no prejudice" rule—a common-law rule that has been legislatively abrogated as to insurance policies issued since January 17, 2009 (*see* Insurance Law § 3420 [a] [5], as amended by L 2008, ch 388)—"the notice provision for a primary insurer operates as a condition precedent and . . . the insurer need not show prejudice to rely on the defense of late notice" (*Unigard Sec. Ins. Co. v North Riv. Ins. Co.*, 79 NY2d 576, 581 [1992] [hereinafter, *Unigard I*], citing *Security Mut. Ins. Co. of N.Y. v Acker-Fitzsimons Corp.*, 31 NY2d 436, 440 [1972]; *see also American Home Assur. Co. v International Ins. Co.*, 90 NY2d 433 [1997] [applying the "no prejudice" rule to excess insurance policies]). As plaintiffs also acknowledge, analytically, the "no prejudice" rule—a rule of construction that is applied to insurance policies that are silent as to the effect of late notice in the absence of prejudice—could not apply to the notice requirement of section 8.1 (c) of the SPA, which unequivocally states that lack of prompt notice will not affect any otherwise existing right to indemnification "except to the extent that [the indemnitor] is actually prejudiced thereby." This means that prejudice from late notice is to be demonstrated, not presumed.[6]

What we must determine, therefore, is the standard that plaintiffs must meet to demonstrate that the untimely notice of the second audit that they received caused them actual prejudice, and whether, on this record, that standard has been met. We agree with plaintiffs that, contrary to the view of Supreme Court and the position of defendants, in view of their "sole right" under the SPA to "control" the defense of the second audit (expressly including the rights to choose counsel and to settle), plaintiffs need not establish "tangible economic injury" to show that they have been actually prejudiced by the late

---

**6.** Since the express terms of the SPA's tax indemnity provision preclude application of the "no prejudice" rule, there is no occasion to consider whether the "no prejudice" rule can have any application to an indemnity provision in a stock or asset purchase agreement, as opposed to an insurance policy.

notice.[7] Rather, to establish actual prejudice due to late notice, it suffices for an indemnitor afforded the right to control the defense of an idemnifiable claim to show that it was deprived of its right to exercise that right for a material portion of the proceedings on the claim. We need not plumb the minimum showing this would require because the 21-month period during which Dearborn defended the audit itself without notice to plaintiffs—including the entire pendency of the unsuccessful Amparo proceeding in Mexican federal court and the SAT's completion of its review of the relevant records and rendering of an adverse tax assessment, albeit one subject to administrative appeal and possible judicial annulment—more than meets the standard of a material deprivation of the right to control the defense of the audit. Indeed, this deprivation of plaintiffs' right to control the defense of the second audit constitutes an independent material breach of the SPA relieving plaintiffs of their indemnity obligations with respect to this particular audit, without regard to the late notice.

Defendants argue that the standard for determining whether late notice of an indemnifiable claim has caused actual prejudice to the indemnitor should be a showing of "tangible economic injury." This standard is derived from *Unigard Sec. Ins. Co., Inc. v North Riv. Ins. Co.* (4 F3d 1049 [2d Cir 1993] [hereinafter, *Unigard II*]), a Second Circuit decision addressing the showing that a reinsurer—which, unlike an insurer, could not invoke the "no prejudice" rule—was required to make to establish prejudice from late notice. Although, as previously discussed, the "no prejudice" rule is also inapplicable in this case, critical differences between the rights with respect to control of the defense of the underlying claim held by a reinsurer, on the one hand, and by plaintiffs under the SPA, on the other hand, persuade us that the holding of *Unigard II*, assuming that it accurately states New York law with respect to reinsurers, has no application to an indemnitor having the "sole right" to control the defense of the claim, as do plaintiffs under the SPA.

The Second Circuit decided *Unigard II* after receiving the New York Court of Appeals' answer to a certified question in the above-cited *Unigard I* (79 NY2d 576 [1992], *supra*). The certified question addressed in *Unigard I* was as follows: "Must a reinsurer prove prejudice before it can successfully invoke

---

7. Of course, a showing of "tangible economic injury" would establish actual prejudice. Plaintiffs concede, however, that, on this record, they have not proved that the late notice of the second audit caused them "tangible economic injury."

the defense of late notice of loss by the reinsured?" (*id.* at 581 [internal quotation marks omitted]). The Court of Appeals answered this question in the affirmative—meaning that the "no prejudice" rule then applicable to primary insurers did not apply to reinsurers—based on the "significant and basic differences between primary insurance and reinsurance" (*id.* at 582).[8] In particular, the Court observed: "A reinsurer is not responsible for providing a defense, for investigating the claim or for attempting to get control of the claim in order to effect an early settlement. Unlike a primary insurer, it may not be held liable to the insured for a breach of these duties. Settlements, as well as the investigation and defense of claims are the sole responsibility of the primary insurer; and settlements made by the primary insurer are, by express terms of the reinsurance certificate, binding on the reinsurer. Thus, [the] failure to give the required prompt notice is of substantially less significance for a reinsurer than for a primary insurer" (*id.* at 583 [footnote omitted]).

After further noting that "the interests of a reinsurer and the ceding primary insurer with respect to a pending claim are generally identical" due to provisions of most reinsurance agreements that "leave[ ] reinsurers little room to dispute the reinsured's conduct of the case" (*id.*), the Court of Appeals rejected the reinsurer's argument that it should have the benefit of the "no prejudice" rule because of its "right to associate" in the defense of the claim under the reinsurance agreement: "The 'right to associate' involves the right to consult with and advise the reinsured in its handling of a claim. Unigard [the reinsurer] argues that this right gives it an interest similar to that of a primary insurer and that it, therefore, must have early notice so that it may itself investigate the claim and foreclose the possibility of fraud. We agree that there are cases in which the reinsurer's right to associate may be impaired by late notice from the reinsured. Nonetheless, because of the critical distinctions between a primary insurer's right to control the investigation and defense of a claim and a reinsurer's 'right of association' with the ceding companies, we cannot agree with Unigard's contention that the risk of such impairment is sufficiently grave to warrant applying a presumption of prejudice" (*id.* at 584).

---

**8.** "A certificate of reinsurance is a contract between two insurance companies in which the reinsured company agrees to cede part of its risk to the reinsurer in return for a percentage of the premium. A reinsurance contract operates solely between the reinsurer and the ceding company. It confers no rights on the insured" (79 NY2d at 582).

When the case returned to the Second Circuit, the federal court held, based on its understanding of the Court of Appeals' answer to the certified question in *Unigard I*, that the reinsurer had not demonstrated that it had been prejudiced by the late notice. The Second Circuit interpreted the Court of Appeals' opinion to "indicate[ ] that . . . the requisite prejudice is limited to economic injury" (*Unigard II*, 4 F3d at 1069). Accordingly, the Second Circuit concluded that the reinsurer, which "conced[ed] . . . that it cannot show an economic loss while arguing that its lost right to associate constitutes the requisite prejudice" (*id.*), had not carried its "burden of showing that it suffered *tangible economic injury* because [the reinsured] failed to give timely notice" (*id.* [emphasis added]).

Since the present case does not involve reinsurance, we need not consider whether the Second Circuit, in *Unigard II*, correctly interpreted the Court of Appeals' opinion in *Unigard I* as requiring a reinsurer mounting a late-notice defense to prove "tangible economic injury."[9] For purposes of this appeal, we assume that a reinsurer must prove that late notice caused it prejudice in the form of a quantifiable "tangible economic injury," and that impairment of the "right to associate" typically afforded to reinsurers does not suffice to this end, as the Second Circuit held in *Unigard II*. Even so, the broad and exclusive "sole right to represent [Dearborn's] interests" in a tax audit conferred on plaintiffs by section 8.5 (b) of the SPA is far more closely analogous to "a primary insurer's right to control the investigation and defense of a claim" (*Unigard I*, 79 NY2d at 584) than to a reinsurer's more limited right to associate. Thus, while plaintiffs still must prove actual prejudice to succeed on their late-notice defense, it would be inappropriate to import *Unigard II*'s requirement that prejudice be demonstrated by proof of "tangible economic injury" from the reinsurance context to this case, where plaintiffs had a right to control

_____

**9.** This Court is not bound, of course, by precedents of federal courts on pure issues of state law (*see e.g. Merrill Lynch, Pierce, Fenner & Smith v Mc-Leod*, 208 AD2d 81, 83 [1st Dept 1995]). We note that neither the phrase "tangible economic injury," nor any phrase having a similar meaning (such as, for example, "pecuniary harm"), appears in the Court of Appeals' *Unigard I* opinion. We also note that the Court of Appeals stated in *Unigard I* that it "agree[d] that there are cases in which the reinsurer's right to associate may be impaired by late notice from the reinsured" (79 NY2d at 584). The question of whether the impairment of a reinsurer's right to associate could, in a proper case, constitute sufficient prejudice to support a late-notice defense was not before the Court of Appeals in *Unigard I*. The certified question simply asked whether a reinsurer "[m]ust . . . prove prejudice" in support of such a defense (*id.* at 581), not what would constitute sufficient prejudice for the defense to succeed.

the defense of the indemnifiable claim far more substantial than a reinsurer's mere right to associate in the reinsured's conduct of its own defense.[10]

Having rejected the "tangible economic injury" standard for a showing of prejudice from late notice in the case of an indemnitor having (as do plaintiffs here) the "sole right" to control the defense and settlement of an indemnifiable claim, as noted, we hold that such late notice actually prejudices the indemnitor when it results in a material deprivation of the indemnitor's right to control the defense of the claim, a proposition that finds support in existing case law. For example, in *Wainco Funding v First Am. Tit. Ins. Co. of N.Y.* (219 AD2d 598 [2d Dept 1995]), the "no prejudice" rule did not apply to the title insurance policy at issue because, although the policy required the insured give the insurer prompt notice of lien foreclosure proceedings, it further provided—much like the SPA in this case—that failure to provide such notice would not affect the insured's rights "unless the [insurer] shall be actually prejudiced by such failure" (*id.* at 599 [internal quotation marks omitted]). The Second Department held that the insured's 20-month delay in notifying the insurer of a tax lien foreclosure proceeding "actually prejudiced" the insurer "[b]y

---

10. We are not persuaded by the contrary holding of *CIH Intl. Holdings, LLC v BT United States, LLC* (821 F Supp 2d 604 [SD NY 2011]), relied upon by Supreme Court in the decision appealed from and by defendants in their briefs. In *CIH*, as here, the plaintiff sellers of a corporation agreed to indemnify the defendant buyer for certain tax losses (*id.* at 607). Similar to the SPA in the present case, the *CIH* agreement required the buyer to provide prompt notice of tax claims asserted by the Brazilian authorities and entitled the seller to "control the conduct" and settlement of proceedings involving tax claims subject to indemnification (*id.*), but provided that the buyer's failure to provide such notice would not defeat the sellers' indemnification obligation except to the extent the seller was "actually prejudiced" thereby (*id.* at 610). Relying solely on *Unigard II*, the *CIH* court concluded that the plaintiff seller must demonstrate "tangible economic injury" as a result of the late notice because "[a]n indemnitor's loss of the right to associate in the defense of claims is insufficient to constitute prejudice" (*id.* at 612). In so concluding, the *CIH* court equated the reinsurer's right to associate in the defense addressed in the *Unigard* decisions, loss of which was held insufficient to demonstrate prejudice, with the contractual right of the indemnitor to "control the conduct" and settlement of the proceedings at issue in *CIH*, without considering the differences between the two rights. As explained above, the right to control the conduct and settlement of tax related proceedings at issue in *CIH* and in the present case is more akin to a primary insurer's right to investigate and defend a claim, which the Court of Appeals distinguished from a reinsurer's right of association in *Unigard I* (79 NY2d at 584).

depriving [it] of the opportunity to participate in the tax lien proceeding in any way" (*id.*).[11]

Similarly, in *American Ins. Co. v Fairchild Indus., Inc.* (56 F3d 435 [2d Cir 1995] [hereinafter, *Fairchild*]), with respect to insurance policies that—again, like the SPA—"required a showing of prejudice from late notice" (*id.* at 440), the Second Circuit, applying New York law, held that late notice that resulted in "the very deprivation of an opportunity to play a meaningful role in the studies and negotiations that determine the amount for which indemnification is sought is substantial prejudice to an insurer" (*id.*). In this regard, the *Fairchild* court observed: "An insurer cannot be expected to show precisely what the outcome would have been had timely notice been given. This uncertainty, however, is the result of the failure of the insured to comply with the policy, and it should not be permitted to use that uncertainty as a weapon against the insurer" (*id.* at 440-441).[12]

In this case, we need not define the lower limit of what would

---

**11.** While the insurer in *Wainco* did not receive notice of the foreclosure proceeding until after the insured had unsuccessfully appealed from an adverse judgment (219 AD2d at 599), the Second Department did not base its determination that the insurer had been prejudiced upon a finding that the insurer could have obtained a more favorable result had it participated in the defense of the proceeding.

**12.** See also *Hartford Fire Ins. Co. v Baseball Off. of Commr.* (236 AD2d 334, 334 [1st Dept 1997] [even if the "no prejudice" rule did not apply to the subject excess insurance policy, the insureds' "late notification actually prejudiced the excess insurer" by "preclud(ing) a timely investigation of (the insureds') claims and the chance to effect an early settlement," where it was contended that the excess insurer had the duty to defend the underlying lawsuit], *lv denied* 90 NY2d 803 [1997]); *Hovdestad v Interboro Mut. Indem. Ins. Co.* (135 AD2d 783, 784 [2d Dept 1987] [noting in dictum that, although timely notice was a condition precedent to coverage under the subject insurance policy, "the prejudice to the insurer (was) evident" in that the insured's initially undertaking his own defense of the underlying claim "effectively deprived the (insurer) of the opportunity to participate in pretrial discovery proceedings when such would have been meaningful"]). *Wainco, Fairchild, Hartford,* and *Hovdestad* cannot be distinguished on the ground that they involved insurers to the extent their reasoning is not based on the "no prejudice" rule. In particular, *Wainco* and (in pertinent part) *Fairchild* concerned insurance policies to which the "no prejudice" rule did *not* apply. Although the case has not been cited by the parties, we note that *U.S. Bank Natl. Assn. TR U/A DTD 12/01/98 v Stewart Tit. Ins. Co.* (37 AD3d 822 [2d Dept 2007]), which cited but did not follow *Wainco,* is inapposite. In *U.S. Bank,* a title insurer unsuccessfully argued that the insured junior mortgagee's late notice of a foreclosure action by a senior mortgagee had prejudiced the insurer by preventing it from participating in the foreclosure action. This argument was rejected on the ground that, on the record in *U.S. Bank,* there was an "apparent lack of equity" in the property (37 AD3d at 825), so that any intervention by the insurer in the senior mortgagee's

constitute a material deprivation of plaintiffs' "sole right" to control the defense of the second audit under the SPA. The 21-month period in which Dearborn defended the audit itself, without notice to plaintiffs—during which the SAT completed its review of the relevant records and reached an initial tax deficiency assessment, and including the entire pendency of an Amparo court proceeding that unsuccessfully sought to terminate the audit on constitutional grounds, as well as the unsuccessful appeal from the dismissal of the Amparo—unquestionably constituted a material deprivation of plaintiffs' "sole right to represent [Dearborn's] interests" in the second audit under section 8.5 (b) of the SPA and, therefore, "actually prejudiced" plaintiffs within the meaning of section 8.1 (c) of the SPA.[13] We note that this construction of section 8.1 (c) does not leave the provision's actual prejudice requirement without effect, since notice that is not prompt may still come before the indemnitor has been materially deprived of its right to control the defense of an audit. Here, however, such was not the case.[14]

The Cancino affirmation submitted by defendants does not lead us to reach a different conclusion. In that affirmation, a Mexican attorney opined that "all issues pertaining to the tax assessment, whether procedural or on the merits, may be raised in the Nullity petition in the annulment proceeding [which Dearborn commenced after plaintiff refused the demand for indemnification] even if they were not raised at any other means of defense [sic] previous to the SAT's assessment. Thus, under Mexican law and procedures, when the Nullity petition was filed (in I was informed in August 2014 [sic]), the taxpayer

---

foreclosure action would have been futile. Unlike *U.S. Bank,* nothing in the record of this case establishes that plaintiffs' defense of the second audit would have been futile or no more successful than Dearborn's conduct of its own defense.

**13.** Again, section 8.5 (b) provides that plaintiffs' "sole right to represent [Dearborn's] interests" in a tax audit includes "the right to control any such Tax Audit, the right to settle, compromise and/or concede any such Tax Audit and the right to employ counsel of [plaintiffs'] choice at [their] expense."

**14.** To reiterate, plaintiffs' obligation to indemnify defendants with respect to the second audit is excused not merely because plaintiffs were deprived of their contractual right to control the defense of the audit for some period of time, but because that deprivation was indisputably material. Hypothetically, had Dearborn initially responded to the SAT but then notified plaintiffs and tendered the defense to them before the audit reached a critical stage, we might have reached a different result. In fact, however, plaintiffs did not receive notice until after the SAT had completed its review of the relevant records and had rendered an adverse assessment, which would become final unless successfully appealed or judicially annulled. As a matter of law, this constituted a material deprivation of plaintiffs' "sole right" to control the defense of the audit under the SPA.

had the right and opportunity to raise any fact or issues pertaining to the determination of owed taxes and charges, as well as procedural issues present at the time of the SAT's commencement of the correspondence audit procedure and procedural issues that have arisen since that date."

Initially, we find that the Cancino affirmation, which does not include a single citation to, or quoted excerpt from, any Mexican statute, regulation, rule, or decision of a court or administrative tribunal, is too vague and conclusory to provide us with "sufficient information" to enable us to take judicial notice of Mexican law under CPLR 4511 (b) (*see Warin v Wildenstein & Co.*, 297 AD2d 214, 215 [1st Dept 2002]). However, even if the Cancino affirmation is taken at face value, it does not negate plaintiffs' showing that they were prejudiced by being completely deprived of their right to defend the second audit for nearly two years. While it is of course impossible to reconstruct what would have happened had plaintiffs undertaken the defense of the second audit from the outset, as was their "sole right" under the SPA, it is possible that they would have chosen to settle the matter at an early stage, thereby avoiding further defense costs. Similarly, whether plaintiffs chose to fight the audit or to settle, it is possible that plaintiffs would have achieved a more favorable result than the assessment of approximately US $2.2 million that the SAT rendered against Dearborn before the latter finally tendered its defense to plaintiffs. To paraphrase one of the decisions cited above, plaintiffs "cannot be expected to show precisely what the outcome would have been had timely notice been given. This uncertainty, however, is the result of the failure of [defendants] to comply with the [SPA], and [they] should not be permitted to use that uncertainty as a weapon against [plaintiffs]" (*Fairchild*, 56 F3d at 440-441).

An additional ground for relieving plaintiffs of their indemnity obligations with respect to the second audit—independent of defendants' failure to give timely notice—is that the deprivation of plaintiffs' "sole right" to defend the audit for 21 months, until after the SAT had completed its review and rendered an adverse assessment, constituted a sufficiently material breach of the indemnity provisions of the SPA to excuse plaintiffs' duty to indemnify with respect to this audit (*see Unigard I*, 79 NY2d at 584 [noting "the general contract law principle that a breach will excuse performance (by the party not in breach) . . . if it is material or demonstrably prejudicial"]; *see also id.* at 581 ["ordinarily one seeking to escape the obligation to perform under a contract must demonstrate a material breach or

prejudice (by the other party)"]). Hypothetically, if defendants had given plaintiffs timely notice of the commencement of the second audit, but had refused to honor plaintiffs' "sole right" to conduct the defense of the audit for 21 months, the failure to tender the defense of the audit would unquestionably constitute a material breach excusing plaintiffs' performance. The conclusion should be no different simply because the same situation results from defendants' failure to give notice of the audit for 21 months. In this regard, under the familiar principles that "a contract should be read as a whole, and every part will be interpreted with reference to the whole" (*Beal Sav. Bank v Sommer*, 8 NY3d 318, 324 [2007] [internal quotation marks omitted]), and that "[a]ll parts of an agreement are to be reconciled, if possible, in order to avoid inconsistency" (*National Conversion Corp. v Cedar Bldg. Corp.*, 23 NY2d 621, 625 [1969]), a material deprivation of plaintiffs' "sole right" to defend the second audit that has resulted from late notice should, as noted, be deemed to have "actually prejudiced" plaintiffs within the meaning of the relevant notice provision of the SPA.[15] Concur—Tom, J.P., Friedman, Saxe and Gische, JJ. ∎

---

15. Defendants argue that plaintiffs' right under section 8.5 (b) of the SPA to control the defense of a tax audit for which plaintiffs had an indemnity obligation under section 8.1 (a) "did not go to the 'root' of the [SPA] transaction" and, therefore, defendants' breach of the former provision should not excuse plaintiffs' performance under the latter provision. This argument is misplaced. Plaintiffs are not arguing that the deprivation of their right to defend the audit should excuse them of their obligations under the SPA in toto, but only of their directly corresponding obligation to indemnify defendants with respect to this particular audit. Plaintiffs' bargained-for "sole right" to defend a tax audit as to which they have indemnity obligations certainly does go to the root of their agreement to provide such indemnification.